THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| K.G., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No.: 1:25-cv-699 (WEF) |
| | : | |
| FRANK J. BISIGNANO, | : | |
| COMMISSIONER OF THE | : | |
| SOCIAL SECURITY ADMINISTRATION,[1] | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), Plaintiff K.G. seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claims for disability insurance benefits and supplemental security income under the Social Security Act. The Commissioner's final decision is based on a finding by the Administrative Law Judge ("ALJ") and Appeals Council for the Office of Appellate Operations ("Appeals Council") that K.G. was not disabled as defined by the Social Security Act and applicable regulations.[2] The matter is before the Court on cross-motions for summary judgment.[3] For the following reasons, the Court finds that the Commissioner's final decision is supported by substantial evidence and complies with the Social Security Act and applicable regulations and

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Frank Bisignano, the current Commissioner of the Social Security Administration, is automatically substituted for Leland Dudek, the former Acting Commissioner of the Social Security Administration.

[2] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Dkt. 4). In accordance with those rules, this Memorandum Opinion omits any personal identifying information such as plaintiff's full name, social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

[3] On October 1, 2025, the parties consented to the jurisdiction of the undersigned magistrate judge (Dkt. 9), and the District Judge entered an Order granting jurisdiction to the undersigned to resolve this case on the merits (Dkt. 10).

therefore orders that K.G.'s motion for summary judgment (Dkt. 11) is **DENIED**, the Commissioner's motion for summary judgment (Dkt. 16) is **GRANTED**, and the case is **DISMISSED**.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On December 15, 2017, K.G., a 28-year-old female who was gainfully employed as an elementary school teacher, slipped on ice and suffered a head injury. (AR 106, 264, 388). She went to the emergency room the same day and complained of constant pain and intermittent dizziness following the fall. (AR 388). As detailed below, K.G.'s physical and mental condition declined throughout 2018 to the point where she could no longer return to work as a teacher. (AR 29, 410, 435, 512, 524-26, 528, 530, 531, 622-24, 675-76, 694-95, 701, 717, 718, 768, 926-28, 932,1147-53, 1312-25, 1576).

On January 24, 2019, K.G. filed an application for Title II Disability Insurance Benefits, alleging she was disabled as of December 15, 2017, the date of her fall, due to a brain injury, post-concussive syndrome, neurocognitive impairment, convergence insufficiency, euphoria, and vestibular ocular dysfunction. (AR 13, 228, 263).[4] Disability is defined under the Social Security Act as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. *See* §§ 216(i), 223(d) and 1614(a)(3)(A). Stated plainly, K.G. alleges she is entitled to Social Security disability benefits because the injuries she suffered as a result of her fall on the ice left her unable to work and earn a living.

[4] It is undisputed that K.G.'s earnings history establishes insurance coverage under the Social Security Act through December 31, 2023. Therefore, K.G. must establish a disability on or before that date to be entitled to disability insurance benefits. (AR 1303-04).

On November 4, 2019, K.G.'s application for disability insurance benefits was denied based on a finding that she was not disabled as that term is defined by the Social Security Act and applicable regulations. (AR 154-58). This decision was reached after a review of K.G.'s application and her medical history by doctors and other trained staff. (*Id.*)

On December 16, 2019, K.G. requested reconsideration of the denial of her disability insurance claim. (AR 161-68). The application was again reviewed by a physician and a disability examiner who considered new evidence presented by K.G. but reached the same conclusion, namely that K.G. was not disabled under the rules of the Social Security Act. (*Id.*).

On December 7, 2019, K.G. appointed David B. Ashe, an attorney, to represent her with respect to her claims. (AR 159). On April 23, 2020, K.G. requested a hearing before an ALJ, which the Office of Hearing Operations scheduled for November 9, 2020, to be conducted virtually. (AR 169-73).

On November 9, 2020, the assigned ALJ held a hearing on K.G.'s disability claims. (AR 37-105). K.G. appeared with her counsel, Mr. Ashe. (AR 37, 38). K.G. provided testimony and answered questions posed by the ALJ and by her counsel. (AR 47-98). An independent vocational expert, Dominique Warner, also testified and answered hypothetical questions posed by the ALJ predicated on the evidence in the record. (AR 98-104). The record also included medical evidence, opinions, and recommendations from her health care providers, which are summarized below.

On December 2, 2020, the ALJ issued a decision finding that K.G. was not disabled under sections 216(i) and 223(d) of the Social Security Act. (AR 10-31). The ALJ found K.G. not to be disabled even though she suffered from several severe impairments including concussion, head injury, post-concussion syndrome, cognitive disorder, anxiety disorder, and adjustment disorder (AR 15-16) and was not able to return to her job as a teacher. (AR 29-30). The ALJ determined

that K.G. had the "residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c)" with some notable limitations (AR 19) and therefore had the ability to make a "successful adjustment to other work that exists in significant numbers in the national economy." (AR 31). In short, K.G. was not disabled because she could perform other work.

K.G. then requested review of the ALJ's decision by the Social Security Administration's Appeals Council. (AR 1). On January 25, 2021, the Appeals Council denied K.G.'s request, finding no reason under its rules to review the ALJ's decision. (AR 1-5). As a result, the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. (AR 1).

On March 23, 2021, K.G. filed her first appeal seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (1:21-cv-356-LMB). The parties filed cross-motions for summary judgment and on April 9, 2022, the Honorable Leonie M. Brinkema, United States District Judge, heard oral argument on the motions. (*Id.*, Dkts. 16, 19, 27). The Court granted K.G.'s summary judgment motion in part, denied the government's summary judgment motion in full, vacated the final decision of the Commissioner and remanded the matter back to the ALJ "for further consideration of the issues described in open court, including [K.G.'s] capability to sustain regular attendance and performance at work given the number of doctor appointments she must attend and the medical evidence of her symptoms." (*Id.*, Dkt. 28).

On remand, the ALJ held a second administrative hearing by telephone on May 12, 2023, to address the issues raised by Judge Brinkema. K.G. elected not to testify and she requested, through counsel, a decision based on the existing record. (AR 1310, 1354-60). On October 23, 2023, the ALJ held a third administrative hearing by telephone during which the ALJ heard additional testimony from Carmine Abraham, a vocational expert, and received further evidence

from K.G., including additional medical evidence and statements from third parties, and considered a supplemental brief submitted by K.G.'s counsel, Mr. Ashe. (AR 1310, 1336-1353). K.G. waived her right to appear and testify at the October 23 hearing as well. (AR 1310, 1338, 1339). K.G.'s counsel appeared on her behalf at both the May 12 and October 23 hearings and made arguments to the ALJ on K.G.'s behalf. (*Id.*). On November 29, 2023, the ALJ issued a second decision in which he again found that K.G. was not disabled under sections 216(i) and 223(d) of the Social Security Act (AR 1299-1335).

K.G. then requested review of the ALJ's November 29, 2023 decision by the Social Security Administration's Appeals Council. On February 18, 2025, the Appeals Council denied K.G.'s request, again finding no reason under its rules to review the ALJ's decision. (AR 1288-92). As a result, the ALJ's November 29 decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. (AR 1289).

K.G. was given sixty (60) days from the denial by the Appeals Council to file a civil action challenging the ALJ's November 29 findings and the Commissioner's decision. *See* 20 C.F.R. §§ 404.981, 416.1481; AR 2. On April 23, 2025,[5] K.G. filed this civil action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (Dkt. 1).[6]

On October 1, 2025, the parties consented to the jurisdiction of the undersigned magistrate judge to conduct all proceedings and rule on the merits of this case. (Dkt. 9). The same day, the District Judge entered an Order authorizing the undersigned to "conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. §636(c) and Fed.R.Civ.P. 73." (Dkt. 10). K.G.

---

[5] The 60-day deadline begins five days after the date of the notice letter from the Appeals Council. Therefore, Plaintiff's civil action was timely filed. (AR 1289).

[6] To be clear, the Court is addressing every issue raised by K.G. challenging the ALJ's November 29, 2023 decision, not only whether the ALJ complied with the scope of Judge Brinkema's April 9, 2022 remand Order.

then filed her motion for summary judgment on October 10, 2025. (Dkts. 11, 12).[7] The Commissioner filed his cross-motion for summary judgment on December 14, 2025. (Dkts. 16, 17).[8] On December 22, 2025, K.G. filed a reply brief. (Dkt. 19). The parties' cross-motions for summary judgment are now ripe for disposition.[9]

## II. STANDARD OF REVIEW

Under the Social Security Act, the district court will affirm the Commissioner's final decision "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." (*Id.*) (internal quotations and citations omitted). In determining whether a decision is supported by substantial evidence, the court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." (*Id.*) (alteration in original) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). It is the ALJ's duty, and not that of the reviewing court, to resolve evidentiary conflict. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir.

---

[7] Dkt. 12 is K.G.'s Brief in Support of Motion for Summary Judgment.

[8] Dkt. 17 is the Commissioner's Brief in Support of Motion for Summary Judgment.

[9] On October 15, 2025, the Clerk of Court filed a Notice of Correction requiring K.G. to either file a Notice of Hearing or a Notice of Waiver of Hearing. K.G. never did so. On December 14, 2025, the Commissioner filed a Notice of Waiver of Hearing. (Dkt. 18). The undersigned finds oral argument would not aid in the decisional process.

1996). "When the ALJ does that by applying the correct factors, [the Court] won't Monday-morning-quarterback the decision unless it is exceptionally clear that the ALJ made a mistake." *Drumgold v. Comm'r of Soc. Sec.*, 144 F.4th 596, 605 (4th Cir. 2025).

## III. SUMMARY OF THE ALJ'S FINDINGS

### *A. The ALJ's November 29, 2023 Decision Followed the Required Five-Step Sequential Evaluation to Determine Disability*

The five-step sequential evaluation requires the ALJ to determine whether a claimant (1) is currently engaged in substantial gainful employment; (2) has a severe impairment; (3) has an impairment that meets or equals any of the impairments listed in Appendix 1, Subpart P of the regulations that are considered *per se* disabling; (4) has the ability to perform past relevant work; and (5) if unable to return to past relevant work, whether the claimant can perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(a) and 416.920(a). The claimant bears the burden to prove disability for the first four steps of the analysis. *See McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir. 1983). The burden then shifts to the Commissioner at step five. *See id.* The regulations promulgated by the Social Security Administration provide that all relevant evidence will be considered in determining whether a claimant has a disability. *See* 20 C.F.R. § 404.1520(a)(3).[10]

At step one, the ALJ found that K.G. had not engaged in substantial gainful employment since December 15, 2017, the date of her fall and the onset date of her claimed disability. (AR 1304). K.G. does not challenge this finding. (Dkt. 12).

At step two, the ALJ found K.G. to have "the following severe impairments: concussion/head injury/traumatic brain injury/post-concussion syndrome/post-traumatic

---

[10] It is this process that the Court examines to determine whether the correct legal standards were applied and whether the ALJ's final decision is supported by substantial evidence. *See id.*

migraine/vertigo; anxiety disorder, adjustment disorder, cognitive/major neurocognitive disorder due to traumatic brain injury." (AR 1305).[11] K.G. does not challenge these findings. (Dkt. 12).

At step three, the ALJ found that K.G. does not have an impairment that meets or equals any of the impairments listed in Appendix 1, Subpart P of the regulations. (AR 181-83). If the ALJ had found that K.G.'s impairments met these criteria, then she would be considered *per se* disabled and the ALJ would award Social Security benefits after step three and skip the step four and step five analysis. 20 C.F.R. Part 404. K.G. does not challenge the ALJ's finding that her impairments are not listed in Appendix 1, Subpart P, and therefore K.G. concedes that it was appropriate for the ALJ to proceed to steps four and five.

Before addressing steps four and five, the ALJ must determine K.G.'s residual functional capacity. 20 C.F.R. 404.1520(e) and 416.920(e). A person's residual functional capacity is their ability to do physical and mental work activities on a sustained basis despite limitations from their impairments. 20 C.F.R. 1545(a). In making this finding, the ALJ must consider all impairments, including impairments the ALJ finds not to be severe. 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p.

Here, the ALJ concluded that K.G. has the "residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c)." (AR 1309). However, the ALJ also concluded that K.G. had several limitations on her ability to work, namely that she "can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can never climb ladders, ropes, and scaffolds. She can frequently rotate, flex, and extend her neck. She must avoid concentrated exposure to extreme cold, extreme heat, wetness, excessive vibration, and pulmonary irritants such as fumes,

[11] This differs only slightly from the ALJ's December 2, 2020 finding in which he determined that K.G. suffered from severe impairments including concussion, head injury, post-concussion syndrome, cognitive disorder, anxiety disorder, and adjustment disorder. (AR 15-16).

odors, dust, gases, and poorly ventilated areas. She must avoid moderate exposure to excessive noise, hazardous moving machinery, and unprotected heights. She must wear a wide-brimmed hat when exposed to bright fluorescent lights or full sun. She can only perform [work that is] simple, routine, repetitive, low stress (no strict production quotas, no assembly line pace work), involving occasional interaction with supervisors, co-workers, and the general public. She can tolerate occasional changes in a routine work setting." (*Id.*).

At step four, the ALJ found that the "requirements of [K.G.'s] past relevant work [as a pre-school and elementary school teacher] exceeds [her] residual functional capacity . . . [and therefore K.G.] is unable to perform her past relevant work." (AR 1325). In this appeal, K.G. challenges the legal sufficiency of the ALJ's findings regarding her residual functional capacity but agrees that she cannot return to her prior work as a teacher. (Dkt. 12).

At step five, the ALJ found that based on K.G.'s "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform. (AR 1326). If there are jobs that exist in significant numbers in the national economy that K.G. can perform, then K.G. is not disabled under the Social Security Act. Whether K.G. can perform other work is determined by the scope of the ALJ's findings regarding her residual functional capacity. And the residual functional capacity is determined in large part by the ALJ's evaluation of the medical evidence and the opinions of medical professionals in the record. K.G.'s challenge to the legal sufficiency of the ALJ's findings defining her residual functional capacity is at the core of this appeal. In short, K.G. alleges that the ALJ failed to properly weigh the medical and opinion evidence in the record, and if he had done so in accordance with the law, then he would have determined that there are no other jobs that K.G. can perform. (Dkts. 12, 19). On the other hand, the Commissioner takes the position that the ALJ

properly weighed the evidence, and it is not the role of this Court to second guess the ALJ's findings of fact. (Dkt. 17). As noted above, the standard by which this Court must evaluate the ALJ's findings regarding K.G.'s residual functional capacity is whether they are supported by substantial evidence. To make this determination the Court must first review the evidence before the ALJ.

*B. Summary of Medical and Opinion Evidence in the Record*

In his November 29, 2023 opinion, the ALJ summarized the relevant medical and opinion evidence he used to determine K.G.'s residual functional capacity. (*See generally*, AR 1312-25). The summary is based on the ALJ's review of the source level medical records and reports prepared by K.G.'s treating physicians and other health care professionals. (*Id.*). Neither party contests the accuracy of the ALJ's summary. (Dkts. 12, 17, 19). Rather, K.G.'s appeal challenges the conclusions drawn by the ALJ from the medical records and reports. (Dkts. 12, 19).

*K.G.'s December 15, 2017 Fall and Emergency Room Treatment*

As noted above, K.G. claims she is disabled due to a head injury she sustained on December 15, 2017, after she fell on ice. (AR 388, 1312). K.G. went to the emergency room the same day and complained of a persistent headache and intermittent dizziness due to the fall and a feeling of pressure on the left side of her head where she was injured. (*Id.*). K.G. was examined by an emergency room physician along with a physician's assistant and diagnosed with a concussion without the loss of consciousness. (*Id.*). The physician observed redness on the left lateral cheek area where she struck her head, but the physical and neurological exam revealed no additional concerns. (*Id.*). For example, K.G. was alert and oriented, there was no nystagmus, her cerebellar function was intact, she ambulated well with a steady gait, and her musculoskeletal strength and sensation were normal. (*Id.*). At the time of her discharge, K.G. was given Tylenol for her headache

and she told the doctor she was feeling "a little better." (*Id.*). K.G. was advised to rest, be re-evaluated the next day and return to the emergency room if her symptoms worsened. (*Id.*).

*December 2017 and January 2018 Follow-Up Evaluation at Lorton Station Family Medicine*

On December 18, 2017, three days after the fall, K.G. was seen by Dr. Jessica McKafee, M.D., her primary care physician, at Lorton Station Family Medicine, for a post-concussion examination. (AR 685).[12] Dr. McKafee's report does not reflect any change in K.G.'s symptoms. (*Id.*). Dr. McKafee provided concussion care instructions and recommended a referral to a concussion clinic. (AR 686).

On January 4, 2018, and again on January 11, 2018, K.G. was seen by Dr. David Lee, M.D., another physician at Lorton Station Family Medicine. (AR 680, 682-84, 687-89, 1312). On January 4, 2018, K.G. advised Dr. Lee that she was suffering from headaches and had trouble concentrating. (AR 682). She stated that the symptoms had initially improved but then "restarted." (*Id.*). Dr. Lee diagnosed K.G. with post-concussion syndrome and advised her to continue taking Tylenol for headaches, prescribed meclizine for dizziness and vertigo, and to follow-up in one week. (AR 684). Dr. Lee and K.G. also discussed a "return to activity plan" which included K.G.'s return to work on January 15, 2018. (AR 684, 689).

Dr. Lee again saw K.G. on January 11, 2018, for the one-week follow-up appointment. (AR 680). At this appointment K.G. told Dr. Lee that her symptoms had not improved. (*Id.*) Dr. Lee then referred K.G. to a neurologist for further examination and treatment. (AR 680, 687). Dr.

---

[12] This appointment is omitted from the ALJ's analysis of K.G.'s residual functioning capacity, but this omission does not materially impact the ALJ's findings or affect this Court's ability to thoroughly review the Commissioner's denial of benefits.

Lee also determined that any return to work was dependent upon the results of the neurological examination. (AR 688).

*January 15, 2018 Examination by Dr. Tracy V. Fulton, M.D.*

In accordance with Dr. Lee's referral, K.G. was examined on January 15, 2018, by Dr. Fulton, a neurologist with Integrated Neurology Services. (AR 399-407, 410-12). At her appointment, K.G. complained of dizziness and headaches. (AR 405). The headaches lasted more than half of the day and were bifrontal and periorbital with a "5/10 throbbing pressure." (*Id.*). K.G. stated that Tylenol and meclizine were helpful in relieving the symptoms. (*Id.*). K.G. also stated that she had difficulty with mental processing and trouble falling asleep. (*Id.*). In addition, Dr. Fulton reported photosensitivity and phonophobia. (*Id.*).

Dr. Fulton's examination of K.G., however, identified no abnormalities. (AR 406). As the ALJ noted, Dr. Fulton's examination of K.G. revealed "intact mentation, intact cranial nerves, full muscle strength, normal muscle bulk/tone, intact sensation, normal coordination, intact reflexes, and normal gait and stance." (AR 1312). However, given K.G.'s diagnosis of post-concussion syndrome and her ongoing headaches, Dr. Fulton prescribed nortriptyline, an anti-depressant that is also prescribed to relieve chronic pain.[13] (AR 407, 1312). Dr. Fulton did conclude that K.G. was, at least at that time, not able to go back to work. (AR 408). Finally, Dr. Fulton noted that 10 to 15 percent of people with post-concussion syndrome have symptoms that last longer than three months. (AR 407, 1312).

---

[13] *See* National Institute of Health, National Library of Medicine, National Center for Biotechnology Information, Gagindip Merwar, Jonathan Gibbons, Seyed Hosseini, Abdolreza Saadabadi, Updated June 5, 2023.

*February 2018 to July 31, 2018 Examinations by Dr. Korin Hudson Fabian, M.D. as well as Physical and Occupational Therapy at MedStar NRH*

K.G. was first evaluated by Dr. Hudson on February 9, 2018, at MedStar National Rehabilitation Hospital. (AR 512). K.G. reported that due to her fall on the ice she continued to suffer from headaches, dizziness, and nausea as well as an inability to focus, blurry vision, fatigue, light and sound sensitivity. (*Id.*). K.G.'s physical exam was normal. (AR 514). Dr. Hudson's treatment plan included physical and occupational therapy as well as an evaluation by a neuropsychologist to define K.G.'s cognitive limitations. (AR 515). This treatment plan was designed "to get [K.G.] back to work." (*Id.*).

K.G. had a follow-up appointment with Dr. Hudson on March 9, 2018. (AR 516). K.G. reported that her symptoms were the same or slightly worse since her February 9, 2018 appointment. (*Id.*). K.G. also reported that her symptoms now included trouble processing conversations, trouble remembering, and double vision. (*Id.*) However, K.G. stated that she was able to walk every day for an hour and do "gentle yoga." (AR 517). Again, K.G.'s physical exam was normal. (AR 518). Dr. Hudson's treatment plan included continued physical and occupational therapy as well as 100 milligrams of gabapentin and up to 300 milligrams of titrate to help alleviate K.G.'s headaches. (*Id.*).

K.G.'s next appointment with Dr. Hudson was on April 13, 2018. (AR 520). At this appointment, K.G. reported that her headaches "may be getting a bit better." (AR 521). K.G. also reported that she continued to walk outside for exercise and do yoga. (*Id.*). Again, the physical exam revealed no evidence of a medical disability. (AR 522). Dr. Hudson reviewed the results of K.G.'s neurocognitive testing and determined that "anxiety plays a significant role in her overall symptoms." (*Id.*). Dr. Hudson also noted that K.G. "seem[s] to be struggling with everyday activities" and suggested "speech-language therapy …would help … better manage these day-to-

day tasks." (*Id.*). Specifically with respect to K.G.'s ability to return to work, Dr. Hudson observed that:

> [K.G.] does seem to be eager to consider a return to work plan. I discussed with [K.G.] the first step in doing so will be having [K.G.] talk to HR about how she could do a gradual return to work plan. I discussed with [K.G.] that [a gradual return to work plan] would have her return partial days with the ability to take short breaks if needed. This is difficult to do sometimes with a teacher's schedule. I am wondering if her employer may be able to provide an alternate site for her to work as she goes through the return to work protocol. I do think she will be able to progress through the steps rather quickly once she gets back into the school setting and we are hopeful that she can return to her classroom on a full-time basis before the end of the year. Her goal is certainly to return to classroom teaching and she is not eager to switch job descriptions entirely. (AR 523).

Beginning February 15, 2018, K.G. underwent physical and occupational therapy at MedStar NRH. (AR 434-511). However, her therapy was discontinued on May 10, 2018, after eight sessions, because she only "made minimal progress toward functional goals." (AR 436).

K.G.'s next appointment with Dr. Hudson was on May 22, 2018, twelve days after her therapy ended. (AR 524). K.G. reported no improvement in her symptoms. (*Id.*). Once again, her physical examination shed no new light on the cause of her symptoms. (AR 525-26). Dr. Hudson noted a likely nexus between K.G.'s anxiety and her cognitive difficulties. (AR 526). At Dr. Hudson's urging K.G. attempted speech therapy to help with her processing issues, but K.G. was resistant and that therapy was only minimally helpful. (AR 527). K.G. was still not able to work but was able to continue doing yoga and walking outside for up to one hour. (*Id.*). Dr. Hudson's goal was for K.G. to return to teaching by the beginning of the next school year, which was approximately three months away. (*Id.*).

K.G.'s final appointment with Dr. Hudson was on July 31, 2018. (AR 528-32). K.G. was accompanied to the appointment by a friend who relayed most of the information about her symptoms to Dr. Hudson. (AR 528). K.G., through her friend, reported no improvement in her

symptoms and, in fact, she claimed that her symptoms had worsened over the past week after stopping gabapentin and Celexa. (*Id.*). K.G.'s chief complaints continued to be daily headaches, dizziness, blurred vision and mental processing issues. (*Id.*). Dr. Hudson noted that K.G. had seen Dr. Jacobs for her blurred vision, she was given a new prescription for eyeglasses, and it was recommended she attend vision therapy. (AR 528). Dr. Hudson also noted that K.G. continued to walk and do yoga. (AR 529). By this time, Dr. Hudson was "concerned that [K.G.'s] symptoms have not improved at all in a significant time and with a number of appropriate interventions." (AR 531). Therefore, Dr. Hudson referred K.G. to Dr. Zorowitz, who she felt had "expertise in more complex brain injuries." (*Id.*).

*March 2018 Examination by Dr. William Gamoe, Ph.D. and Dr. Virginia Patt, Ph.D.*

On March 22 and March 30, 2018, K.G. was examined and underwent neuropsychological testing by Dr. William Gamoe, a board-certified clinical neuropsychologist, and Dr. Virginia Patt, a neuropsychology fellow at MedStar National Rehabilitation Hospital. (AR 594-99). Their diagnoses were that K.G. suffered from generalized anxiety disorder and mild neurocognitive impairment due to a concussion. (AR 994). Drs. Gamoe and Patt summarized their findings as follows:

> [K.G.'s] current neurocognitive profile (i.e., deficits in processing speed and speeded word retrieval in the context of otherwise intact scores) is consistent with mild neurocognitive impairment, very likely due to interaction of multiple factors, including anxiety, nausea, headaches, and sleep issues. It is possible that residual effects of her concussion contribute to problems with processing speed/efficiency. However, the patient also endorsed significant symptoms of anxiety, which is known to impact a person's cognitive functioning and is likely contributing to complicating [K.G.'s] recovery. Behavioral observations during the evaluation suggest that anxiety is a significant concern for her. Very likely the two processes are exacerbating one another at this point. (AR 594-95).

*July 25, 2018 Examination by Dr. Richard Zorowitz, M.D.*

On July 25, 2018, K.G. was examined by Dr. Richard Zorowitz, M.D., who is board-certified in physical medicine and rehabilitation, and specializes in brain injury rehabilitation. (AR 676, 1313). At her appointment, K.G. reported "headaches exacerbated by noises, bright lights, and prolonged reading or screen time [as well as] anxiety [and] visual difficulties including double vision and blurriness." (AR 1313). The ALJ summarized Dr. Zorowitz's examination as follows:

> [K.G.] was independent with her mobility and activities of daily living without an assistive device or orthosis. While she displayed blurry vision with convergence on examination, she otherwise exhibited grossly intact cranial nerves, full range of motion of the neck and back, and full muscle strength throughout. Although she exhibited a balance deficit with single leg stance with her eyes open, there was otherwise no problem with walking on her heels or toes or demonstrating tandem walking. On mental status examination, she was able to spell the word "World" forwards and backwards, recall three objects immediately, recall two out of three objects after three minutes, and recall three out of three objects with verbal cues. While she displayed difficulty interpreting proverbs, she otherwise exhibited grossly intact problem-solving ability. (AR 1314).

Based on his examination, Dr. Zorowitz "recommended that [K.G.] continue speech-language therapy and visual rehabilitation for blurry vision." (*Id.*). This recommendation was likely based in part on the August 2018 notes of K.G.'s speech therapist who concluded that she "demonstrated progress in auditory processing associated with mild cognitive communication disorder." (AR 1314). Dr. Zorowitz adjusted K.G.'s medication by prescribing only nortriptyline and stopping her use of gabapentin and citalopram. (*Id.*, AR 676).[14] Dr. Zorowitz also ordered an MRI and referred K.G. to Dr. Jacobs, OD for visual therapy. (*Id.*)

[14] The next day, July 26, 2018, K.G. met with Dr. Lee, her primary care physician. (AR 675). K.G. reviewed her symptoms with Dr. Lee that included headaches, dizziness, nausea and cognitive issues. (*Id.*). K.G. acknowledged that she can "perform personal hygiene, getting dressed, and self-care, [but] everything else beyond that is taxing and exhaustive." (*Id.*). Dr. Lee noted that K.G. should continue with the treatment plan proposed by Dr. Zorowitz. (*Id.*).

*September 18, 2018 Examination by Dr. Timmothy Yu, M.D.*

On September 18, 2018, K.G. was examined by Dr. Timmothy Yu, M.D., a physician with the Fairfax Family Practice at Fair Oaks. (AR 718). At her appointment, K.G. reported that she was unable to prepare meals for herself, she could not tolerate noise or visual stimuli, she had double vision, was unable to read and comprehend, and was unable to listen and comprehend. (*Id*.). On this last point, Dr. Yu noted K.G.'s claim was "inconsistent with the Neuro-psych testing in March." (*Id*.). Dr. Yu, among other things, ordered an MRI which was performed on September 28, 2018. (AR 798).

*K.G.'s September 28, 2018 MRI*

An MRI of the brain performed in September 2018 revealed no abnormalities. (AR 768, 798, 1312, 1314).

*October 9, 2018 Examination by Dr. Timmothy Yu, M.D.*

On October 9, 2018, K.G. had a follow-up visit with Dr. Yu. (AR 768). K.G. was informed that the results of her MRI were within the normal range. (AR 768). But based on K.G.'s reported symptoms, including ongoing double vision, Dr. Lu "excused [K.G.] from work at this time." (AR 768-69). Dr. Lu recommended that K.G. wear a "brimmed hat inside for light sensitivity[,] reduce to [one] computer screen[,]" and seek a "neuro-optometry consultation." (AR 768-69).

*October 16, 2018 Examination by Dr. Garry Ho, M.D.*

On October 16, 2018, K.G. was examined by Dr. Garry Ho, M.D., a physician with the Fairfax Family Practice at Fair Oaks. (AR 700). The purpose of the examination was for K.G. to undergo neuropsychological testing. (AR 701). In her brief in support of her Motion for Summary Judgment, K.G. states that during the examination she "had somewhat unsteady ambulation." (Dkt. 12 at pg. 8). In fact, what Dr. Ho noted was that K.G. "ambulated well but feels somewhat

unstable." (AR 701). This is relevant because K.G.'s complaint appears inconsistent with Dr. Ho's observations. Regardless, the neuropsychological testing did not result in any change to K.G.'s diagnosis or any new treatment plan. (AR 702-03).[15]

*April 22, 2019 Examination by Dr. Jacobs, OD*

At her appointment with Dr. Jacobs, K.G. reported "blurred and double vision, headaches, dizziness, nausea, balance difficulties, light and sound sensitivity, avoidance of reading or using the computer, while reading: loss of place, blurred vision, double vision, fatigue, poor comprehension, avoidance of driving, sensitivity to movement of objects/people in her periphery, attention/concentration issues, [and] memory issues." (AR 911). After an examination, Dr. Jacobs diagnosed K.G. with convergence insufficiency and exophoria. (*Id*.). Dr. Jacobs recommended a change to K.G.'s eyeglass prescription, use of a Fresnel prism, and optometric visual therapy. (*Id*.).

It should be noted that Dr. Jacobs first examined K.G. in June 2018 based on a referral from Dr. Hudson. (AR 919). Optometric visual therapy was recommended at that time, but K.G. was able to only attend one session in August 2018. (AR 912). In general, K.G. was unable to participate in long-term visual therapy because of headaches, dizziness, and eye fatigue. (AR 1314). But the treatment notes suggest that when K.G. did participate in therapy she made progress and her condition improved. (*Id*.). Importantly, at her April 2019 examination, Dr. Jacobs concluded that "if improvements have not occurred in her visual system, [K.G.] would be unable to find success in any job that involved reading, writing or using a computer due to the sensitivity she had towards any visual stimulation." (*Id*., AR 1322.).

[15] Plaintiff also notes in her brief that on November 6, 2018, she was treated by Suzan Shibla, FNP-BC, with the same family practice and during the examination K.G. reported continued vision problems including double vision, convergence and ocular pain. (AR 694-97; Dkt. 12 at pg. 8). K.G. was then examined by Dr. Jacobs, OD in April 2019.

*April 30, 2019 Examination by Dr. Susan Burroughs, M.D.*

On April 30, 2019, K.G. was examined by Dr. Susan Burroughs, M.D., a physician with Lorton Station Family Medicine. (AR 926-29). At her appointment, K.G. reported memory deficits and an inability to process information. (AR 927). Dr. Burroughs noted K.G.'s "[p]rocessing speed is significantly delayed[;] both input and output in telling a story." (*Id.*). With respect to K.G.'s ability to work, Dr. Burroughs concluded that she is "not currently fit to return to work as a classroom teacher." (AR 928).[16]

*September 26, 2019 Examination by Dr. Miles Diller, Ph.D.*

At her appointment with Dr. Diller, a clinical psychologist, K.G. repeated the same symptoms she gave to other doctors but now reported new symptoms that included trouble signing her name and difficulty bending her head, finding new places, reading, and shopping. (AR 1172, 1314). K.G. did not report any depression or anxiety-related symptoms to Dr. Diller. (*Id*).[17] After a thorough examination (AR 1173-77), Dr. Diller diagnosed K.G. with mild neurocognitive disorder due to a traumatic brain injury. (AR 1177, 1314). Dr. Diller's diagnosis was supported by the following tests and observations as summarized by the ALJ:

1. K.G. walked without assistance and with a normal gait and posture;
2. K.G.'s sensorium was clear and alert;
3. K.G. scored a 27 out of 30 on the Mini Mental State Examination ("MMSE"), suggesting a normal range of cognition;

[16] Plaintiff also notes in her brief that on December 17, 2018, she was "treated" by Dr. Marc Childress, M.D., with the same family practice and during the examination K.G. reported her condition had not improved. (AR 932; Dkt. 12 at pg. 8). However, the purpose of the visit was simply for K.G. to fill out forms and Dr. Childress never performed any physical examination. (AR 932).

[17] At times, the ALJ's opinion mistakenly refers to Dr. Diller as Dr. Miller. (*See* AR 1314).

4. K.G. appeared "fully oriented to time, situation and person, and partly [oriented] to place;"
5. K.G. exhibited good remote memory as she was able to recall the name of her elementary school;
6. K.G.'s fund of general knowledge appeared to be good as she was able to recall the names of the current and recent U.S. Presidents;
7. K.G. demonstrated "fair concentration/working memory" because she was "able to recall four digits forward and four in reverse;"
8. K.G. "exhibited good judgment, good verbal reasoning skills, and logical and relevant thought content without evidence of looseness of associations, perseverations, fabrications, tangentiality or circumstantiality;"
9. K.G.'s Full Scale IQ score was 84, which "placed her comfortably within the low average range of intellectual function as measured by the WAIS-IV;"
10. K.G.'s "verbal reasoning abilities and fluid reasoning, in the perceptual domain, assesses nonverbal concept formation, visual perception and organization, visual-motor coordination, learning, and the ability to separate figure and ground in visual stimuli were all in the average range;" and,
11. K.G.'s "ability to sustain attention, concentrate, and exert mental control was in the low average range." (AR 1172-79; 1314-15).

On the other hand, K.G.'s "ability to process simple or routine visual material without making errors was in the mildly impaired range when compared to her peers . . . [and] her abstract reasoning skills were poor." (*Id.*). Dr. Diller also noted that K.G. "needed help signing a permission form . . . her rate of speech appeared slow . . . [she] related poorly [and] had difficulty following

the conversation at times." (*Id.*).[18] When viewed together, these findings support Dr. Diller's conclusion that K.G. suffered from a "mild neurocognitive disorder." (*Id.*).

*March 2019 to July 2019 Therapy with Dr. Alec A. Lebedun, Ph.D.*

In 2019, K.G. participated in group and individual therapy sessions with Dr. Lebedun, a clinical psychologist, on March 7, April 23, June 3, and July 29. (AR 1147-53). The goal of the therapy was to "gain awareness related to her injury to aid in emotional coping." (*Id.*). On June 28, 2019, after three therapy sessions, Dr. Lebedun authored a letter responding to the question of why K.G. was unable to work considering her "relatively intact neurological" tests. (AR 1154). Dr. Lebedun stated that "[a]lthough neurocognitive testing can be very useful in helping to define cognitive strengths and weaknesses, these findings must be put in context of other sources of data." (*Id.*). Here, the other data relied on by Dr. Lebedun seems to be K.G.'s self-reported symptoms as corroborated by two of her friends. (*Id.*). As a result, Dr. Lebedun concluded that "[i]t remains my opinion that [K.G.] is totally disabled and unable to work in any capacity at this time." (*Id.*).

*October 2019 Review of Medical Records by Dr. William Rutherford, Jr. M.D. and Dr. Richard J. Milan, Jr. Ph.D., State Agency Consultants.*

On October 30, 2019, Dr. William Rutherford, Jr., M.D., a state agency consulting physician, reviewed the medical records K.G. submitted to the Social Security Administration in support of her disability claim. (AR 126-27). The purpose of Dr. Rutherford's review was to determine K.G.'s physical residual functional capacity. (*Id.*). Upon review, Dr. Rutherford summarized K.G.'s physical condition as follows:

> [K.G.] has a history of post-concussion syndrome (due to a fall hitting her head on 12/15/2017), vertigo, headaches, visual disturbances, visual preceptor disorder, convergence insufficiency, exophoria, and mild cognitive communication disorder. An MRI of the brain was normal. She has had vision therapy, and her visual acuity

[18] As discussed in greater detail below, these findings are inconsistent with K.G.'s conduct in the waiting room prior to her appointment with Dr. Diller. There, K.G. was observed engaged in a lengthy conversation with a friend. (AR 1186, 1315).

> is noted to be 20/20, but she continues to have light sensitivity and headaches. On exam, her posture and gait were normal, and she did not use an AD. (*Id.*).

Dr. Rutherford identified several moderate physical limitations that were fully incorporated into the ALJ's ruling regarding K.G.'s physical residual functional capacity. (*Id.*, AR 1309-25).

On October 31, 2019, Dr. Richard J. Milan, Jr., Ph.D., a state agency consultant, reviewed the medical records K.G. submitted to the Social Security Administration in support of her disability claim. (AR 128-33). The purpose of Dr. Milan's review was to determine K.G.'s mental residual functional capacity. (*Id.*). Upon review, Dr. Milan summarized K.G.'s mental condition as follows:

> [K.G.] has a history of post-concussion syndrome (12/15/2017), anxiety, adjustment disorder with depressed and anxious features, mild neurocognitive impairment due to a concussion, and mild cognitive communication disorder. She had a FSIQ score of 84 on the WAIS-IV (VCI 93, PRI 98, WMI 86, PSI 65). WMS-IV showed memory ranging from poor (borderline) to impaired. Exams showed [K.G.] had difficulty following the conversation at times, was alert and oriented, worked well with persistence and concentration, but was exceptionally slow and missing two steps of a three-step instruction. Remote memory was good, fund of knowledge was good, concentration/working memory was fair, [and] abstract reasoning skills were poor. [K.G.] may have problems sustaining concentration and persistence, but she lives alone, drives, performs personal care, cares for pets, [and] prepares simple meals. *She is capable of at least simple routine work* (emphasis added). (AR 128-29).

Dr. Milan identified several moderate mental limitations that were fully incorporated into the ALJ's ruling regarding K.G.'s mental residual functional capacity. (*Id.*, AR 1309-25).

As a result of Drs. Rutherford and Milan's review of K.G.'s claim, as well as other evidence in the record, the disability adjudicator determined that K.G. could work and was therefore not disabled under the Social Security Act. (AR 132). In support of this finding, the disability examiner informed K.G. that:

> Your condition results in some limitations in your ability to perform work related activities. We have determined that your condition is not severe enough to keep you from working. We considered the medical and other information and work

> experience in determining how your condition affects your ability to work. We do not have sufficient vocational information to determine whether you can perform any of your past relevant work. However, based on the evidence on file we have determined that you can adjust to other work. (AR 133).

This finding regarding K.G.'s ability to work is materially similar to the ALJ's ultimate finding on the same issue, which K.G. now challenges. (AR 1326-27).

*April 2020 Reconsideration of the Opinions of Dr. Rutherford and Dr. Milan by Dr. Robert McGuffin, M.D. and Dr. Richard Luck, Ph.D., State Agency Consultants.*

On April 13, 2020, Dr. Robert McGuffin, M.D. reviewed the findings of Dr. Rutherford regarding K.G.'s ability to work in light of her physical residual functional capacity. (AR 135-47). Dr. McGuffin confirmed Dr. Rutherford's findings and determined the decision to deny K.G.'s disability claim "was supported and consistent with the evidence in the file." (AR 147, 151-52).

On April 13, 2020, Dr. Richard Luck, Ph.D., reviewed the findings of Dr. Milan regarding K.G.'s ability to work in light of her mental residual functional capacity. (AR 135-49). Dr. Luck confirmed Dr. Milan's findings and determined the decision to deny K.G.'s disability claim "was supported and consistent with the evidence in the file." (AR 149, 151-52). In addition, Dr. Luck was called upon to address the inconsistency between Dr. Milan's findings and Dr. Diller's report. (AR 149). Specifically, opinions of Dr. Diller and Dr. Milan differed in that Dr. Diller thought K.G.'s "abilities and limitations" were "more restrictive." (*Id.*). In resolving this discrepancy in the evidence, Dr. Luck concluded that Dr. Diller's "opinion is without substantial support from the medical source who made it, which renders it less persuasive." (AR 150). Dr. Luck went on to say that Dr. Diller's "opinion is an overestimate of the severity of [K.G.'s] restrictions/limitations." (*Id.*). In short, Dr. Luck determined Dr. Milan's opinion to be more persuasive than Dr. Diller's opinion. On this point, Dr. Luck's findings are consistent with other medical evidence as well as with the ultimate findings by the ALJ.

*January 2020 to April 2023 Examinations by Dr. Alec A. Lebedun, Ph.D.*

At K.G.'s appointment on January 20, 2020, Dr. Lebedun completed a Mental Medical Source Statement that reflected a diagnosis of adjustment disorder with mixed anxiety and depression, as well as major neurocognitive disorder due to trauma. (AR 1198). His conclusion was that K.G. would suffer from a "marked" level of impairment in a work setting. (*Id.*). Specifically, Dr. Lebedun identified a "marked" or "extreme" level of impairment in the following areas: (1) understanding simple instructions; (2) understanding detailed instructions; (3) remembering locations and work procedures; (4) carrying out simple instructions; (5) carrying out detailed instructions; (6) maintaining concentration for extended periods; (7) working with others without being distracted by others; (8) interacting with the general public; (9) asking questions or requesting assistance; (10) responding to direction from supervisors; (11) responding to changes in the work setting; (12) responding to hazards and taking precautions; and (13) traveling in new places or traveling alone. (*Id.*). Dr. Lebedun also predicted that K.G. would miss at least four days of work per month due to her condition. (*Id.*).

Thereafter, Dr. Lebedun held therapy sessions with K.G. on February 15, 2021 (AR 1558-59), March 15, 2021 (AR 1560-61), June 22, 2021 (AR 1562-63), and November 17, 2021 (1564-66, 1583). These therapy sessions focused on "cognitive refocusing, cognitive reframing, exploration of coping patterns, exploration of relationship patterns, structured problem solving, supportive reflection, and symptom management." (*Id.*). By November 17, 2021, it seems as though K.G. had made some measurable progress. Specifically, Dr. Lebedun observed that K.G. (1) was oriented to person, place and time; (2) her appearance, dress and interview behavior were appropriate; (3) her motor activity was unremarkable; (4) her speech was normal; (5) her affect was congruent; (6) her insight, judgment, and impulse control were good; (7) her thought content

was appropriate; (8) her perception was unremarkable; and (9) her functional status was intact. (AR 1564). On the other hand, Dr. Lebedun also noted that K.G. (1) was anxious; (2) had poor recent memory; (3) was distractable; and (4) had a tangential thought process. (*Id.*). From this, Dr. Lebedun concluded that K.G.'s "deficits are such that she would be unable to follow, comprehend, or attend to the needed details to successfully participate in work duties. She would also be unable to understand the rules related to performing the needed tasks. She would not be able to understand or effectively communicate with coworkers []." (AR 1566).

Finally, on April 12, 2023, Dr. Lebedun wrote a two-page letter in which he set forth his reasoning as to why K.G. was "totally" and "permanently" disabled due to the brain injury she suffered from her fall on the ice in 2017. (AR 1572-73). Dr. Lebedun summarized his findings as follows:

> [K.G.] continues to experience severe processing deficits from her traumatic brain injury that leave her totally disabled. She is unable to process information in a functional manner at a rate that would allow her to learn new job skills. She is also unable to process auditory information in a manner that would allow her to function in a work environment and communicate effectively with supervisors, colleagues, or customers. In addition to the above cognitive issues, she also experiences severe headaches and dizziness that further impact her ability to tolerate a work environment. (*Id.*).[19]

The Medical Source Statement prepared by Dr. Lebedun on April 12, 2023 (AR 1597) closely mirrors the Medical Source Statements he prepared on November 17, 2021 (AR 1583) and January 20, 2020 (AR 1198) even though aspects of his April 12, 2023 report suggest therapy had improved K.G.'s condition. (*See* AR 1564-66).

---

[19] In his April 12 letter, Dr. Lebedun identifies eleven separate "limitations" on K.G.'s ability to work. However, given Dr. Ledebun's conclusion that K.G. is totally disabled, these limitations are read as supporting his finding as to why K.G. is unable to work rather than limitations on her ability to work that should be considered in formulating her residual functional capacity. (AR 1572-73). It is further noted that one limitation seems to be left incomplete in that it says only, "[K.G.] is highly distracted and would struggle significantly if required to." Dr. Lebedun never identifies what tasks would cause K,G. to struggle. (AR 1572).

*May 23, 2022 Letter from Dr. Michael E. Batipps, M.D.*

On May 23, 2022, Dr. Batipps, a neurologist with Neurodiagnostic Associates, prepared a Neurological Independent Medical Reevaluation of K.G. (AR 1567-69).[20] In preparing his report, Dr. Batipps appeared to principally rely on a single telemedicine conference with K.G. and the neurological testing performed at the National Rehabilitation Hospital in March 2018 by Drs. Gamoe and Patt, discussed *supra*. In general, Dr. Batipps' conclusion was that K.G. suffered from significant neurocognitive impairments marked by "reduced recent memory and forgetfulness [as well as] problems with word finding." (AR 1567). In addition, K.G.'s headaches and vertigo "are very disruptive and further reduce her ability to focus and concentrate … which make it difficult for [K.G.] to function at her normal level of activity." (AR 1569). Finally, Dr. Batipps concluded that K.G.'s current condition will not likely improve with further treatment. (*Id.*).

*June 4, 2022 Independent Life Care Evaluation by Dr. Kimberly Salata, M.D*

K.G. was referred by an attorney to Dr. Salata to perform an "independent life care evaluation." (AR 1574).[21] Dr. Salata first evaluated K.G. on April 7, 2020, and then reevaluated K.G. on June 4, 2022. (*Id.*). In preparing her evaluation, Dr. Salata spent seven hours reviewing K.G.'s medical history, two hours and twenty minutes meeting with K.G. and her sister, and conducted a physical examination. (AR 1574, 1580-81). Dr. Salata noted that despite her physical and mental limitations K.G. could engage in many daily activities such as driving, texting, long walks, basic cooking, household chores, managing finances, and long-distance travel, albeit with much help from family and friends. (AR 1579-80). Dr. Salata diagnosed K.G. with mild traumatic brain injury with profound cognitive impact and anxiety that predated her December 2017 fall on

[20] In his report, Dr. Batipps referred to a previous evaluation of K.G. he performed on September 2, 2020. (AR 1567). However, neither party relied on Dr. Batipps' 2020 evaluation.

[21] The referring attorney was not K.G.'s counsel in this case.

the ice. (AR 1581). Dr. Salata also believes that "further neurological recovery is unlikely given the duration of [K.G.'s] symptoms." (AR 1581). With respect to her ability to work, Dr. Salata concluded that K.G. "is totally and permanently disabled from all work environments due to her physical and cognitive limitations." (AR 1582).

*April 12, 2023 Letter from Paula Levin-Alcorn, LCSW, CBIS*

Ms. Levin-Alcorn, a licensed clinical social worker who is also a certified brain injury specialist, is employed by Brain Injury Services, in Springfield, Virginia. (AR 1570). Ms. Levin-Alcorn met quarterly with K.G. and her sister from October 2018 to at least April 2023 to "discuss [K.G.'s] needs and how [Brain Injury Services] can support her." (*Id.*). On April 12, 2023, Ms. Levin-Alcorn authored a letter "to whom it may concern" in which she summarized her observations regarding K.G.'s mental limitations. (*Id.*). The thrust of Ms. Levin-Alcorn's letter is that she believes K.G. is severely impaired, particularly in her ability to process information during a conversation. Ms. Levin-Alcorn concluded that K.G.'s "processing speed is below the 1st percentile." (*Id.*). However, Ms. Levin-Alcorn does not say how she drew such a mathematically specific conclusion. Ms. Levin-Alcorn observed that during a conversation K.G. "cannot follow the question, answer the question, and then remember the question or her response." (*Id.*). Moreover, "[w]hen [K.G.] needs to communicate a thought or explain something, she is currently not able to do it effectively or independently." (*Id.*). It appears Ms. Levin-Alcorn draws this conclusion based on her attempts to engage K.G. in conversation as well as information reported to her by K.G. and her sister.

*C. Summary of the ALJ's Findings Regarding Conflicting Medical Evidence*

The ALJ was faced with conflicting medical opinions regarding whether K.G.'s physical and mental impairments prevented her from holding a job. On the one hand, the record contains

evidence from Dr. Jacobs, Dr. Lebedun, Dr. Salata, and Ms. Levin-Alcorn that, if deemed persuasive by the ALJ, could support a finding that K.G. was unable to work and is therefore disabled. On the other hand, the record contains opinion evidence from Dr. Rutherford, Dr. Milan, Dr. McGuffin, and Dr. Luck that would not support a finding of disability. Ultimately, the ALJ found the opinions finding K.G. could sustain employment to be persuasive. The ALJ further determined that the medical evidence received from K.G.'s other treating physicians and medical evaluators (including Dr. Lee, Dr. McKafee, Dr. Fulton, Dr. Hudson, Dr. Zorowits, Dr. Gamoe, Dr. Patt, Dr. Yu, Dr. Ho, Dr. Burroughs, Dr. Diller, and Dr. Batipps) as well as therapy records and medical evidence from her December 15, 2017 treatment at the emergency room supported his finding that K.G. "suffers from a mild neurocognitive impairment/traumatic brain injury" and her residual functional capacity is sufficient for her to "perform medium work with post-concussion limits," and therefore corroborated his finding that she was not disabled. (AR 1319-25). But the central issue raised by K.G. on appeal challenges the reasons why the ALJ chose not to credit the opinion evidence of Dr. Jacobs, Dr. Lebedun, Dr. Salata, and Ms. Levin-Alcorn, and whether that decision was supported by substantial evidence.

*i. Dr. Jacobs*

Dr. Jacobs concluded that K.G. would be "unable to find success in any job that involved reading, writing or using a computer due to the sensitivity she had towards any visual stimulation." (AR 1322). The ALJ found this opinion to be unpersuasive because it is inconsistent with Dr. Jacobs' other finding that K.G. "retained 20/20 visual acuity with corrective lenses" and because it is "entirely based on [K.G.'s] subjective allegations." (*Id.*). In other words, Dr. Jacobs' opinion was not supported by any objective medical evidence. In addition, Dr. Jacobs' "opinion does not include a vocationally relevant, function-by function assessment with respect to [K.G.'s] ability to

perform exertional and non-exertional basic work-related activities over an eight-hour workday." (*Id.*). Rather, Dr. Jacobs' opinion is premised on whether K.G. would generally be "able to find success" in a job. This is significant because Dr. Jacobs applied a different analytical framework than the ALJ is required to use to determine K.G.'s residual functional capacity and her ability to work. The fact that Dr. Jacobs applied a different metric to opine on the ultimate issue significantly compromised the persuasiveness of his opinion.

*ii. Dr. Lebedun*

Dr. Lebedun concluded that K.G. was "totally" and "permanently" disabled due to the brain injury she suffered from her fall on the ice in 2017. (AR 1572-73). The ALJ rejected this opinion. The ALJ first notes that Dr. Lebedun's conclusion is contrary to the doctor's own findings. Dr. Lebedun describes K.G.'s functional status as only mildly impaired and diagnoses K.G. with a "mild" neurocognitive disorder which is inconsistent with his findings that she suffered from marked limitations and was totally disabled. (AR 1322). The ALJ also determined that Dr. Lebedun's findings regarding K.G.'s inability to function on a daily basis were materially inconsistent with K.G.'s own admissions about her daily activities as well as her cognitive testing. (AR 1323). The ALJ also noted the apparent inconsistency between Dr. Lebedun's finding that K.G. lacked the cognitive skills to hold a job, but at the same time he found her functional status to be intact and that she exercised good judgment and insight. (*Id.*). The ALJ therefore determined that Dr. Lebedun's conclusion that K.G. was "totally disabled and unable to work in any capacity" was internally inconsistent, lacked sufficient factual support, and was unpersuasive. (*Id.*).

*iii. Dr. Salata*

Dr. Salata diagnosed K.G. with mild traumatic brain injury with profound cognitive impact and concluded that K.G. "is totally and permanently disabled from all work environments due to

her physical and cognitive limitations." (AR 1581-82). The ALJ found Dr. Salata's diagnosis of a mild brain injury to be persuasive, but found her assessment that the injury had a profound cognitive impact to be unpersuasive. (AR 1324). Here again, the opinion was entirely conclusory and not supported by a credible factual predicate. In short, the ALJ must have sufficient facts and a clear medical analysis in order to evaluate the persuasiveness of the opinion. As to the "profound cognitive impact" of K.G.'s injury there is simply no medical evidence that would support that conclusion, certainly little beyond the self-serving and marginally corroborated testimony of K.G. Therefore, Dr. Salata's opinion on the ultimate issue of disability without credible factual support is unpersuasive.

*iv. Ms. Levin-Alcorn*

Ms. Levin-Alcorn is a social worker who provides assistance to K.G. as needed. Ms. Levin-Alcorn concludes that K.G. does not have the cognitive skills to process information to the extent necessary to sustain employment. Here again, the ALJ determined this opinion to be unpersuasive because it lacks factual support, is devoid of any meaningful analysis or explanation, is inconsistent with the weight of evidence in this case (including K.G.'s ability to live alone) and simply states a conclusion on the ultimate issue of disability, an issue properly reserved for the ALJ to decide. (AR 1324).

*D. Summary of Testimony and Non-Medical Evidence in the Record*

*i. Investigative Report*

On August 8, 2019, the Social Security's Administration's Extended Service Disability Determination Services ("DDS") referred K.G.'s claim to the Cooperative Disability Investigation

Unit ("CDIU") for investigation.[22] (AR 1183). DDS referred the matter to CDIU because it determined that "inconsistencies exist between the medical records and [K.G.'s] alleged functions." (AR 1183-86). The referral identified K.G.'s claimed limitations which, for the most part, mirrored the mental and physical limitations K.G. reported to her doctors. (*Id.*).

The apparent purpose of the CDIU investigation was to gather information regarding K.G.'s daily activities to determine whether she was being truthful in reporting her physical and mental limitations to her doctors and to the Social Security Administration. The investigation included covert surveillance on two separate days. (AR 1186). The first covert surveillance of K.G. occurred on September 26, 2019. (AR 1186). On that day, K.G. had an appointment with Dr. Miles Diller, Ph.D., a clinical psychologist. (AR 1172-79). An undercover CDIU investigator was present in the waiting room when K.G. and her friend, Ms. Flaherty, arrived for the appointment. (AR 1186). The investigator noted that initially K.G. chose to sit "in a small space" near two other individuals even though more private seats were available. (*Id.*). This is noteworthy because crowds are often a trigger for K.G.'s physical symptoms. (AR 59, 74). The investigator continued to observe K.G. as she waited for her appointment to begin and described her and Ms. Flaherty as "talking nonstop and laughing." (*Id.*). At one point, K.G. "talked about going on vacation to the beach" and at no point did she show any "signs of distress." (*Id.*). This appears to be in marked contrast to her condition when examined a few minutes later by Dr. Diller who noted K.G. "needed help signing a permission form," described her rate of speech as slow, and thought she "related poorly and had difficulty following the conversation at times." (AR 1172-79; 1314-15).

---

[22] According to the Social Security Administration's website, the CDIU is a part of the SSA's Office of the Inspector General that "review[s] questionable disability claims and investigat[es] cases of suspected disability fraud." *See,* www.oig.ssa.gov.

Next, the investigator conducted covert surveillance of K.G. on October 9, 2019. (AR 1186). The investigator observed K.G. leaving her home in Arlington, Virginia at approximately 10:43 a.m. and driving alone to a church located on the 600 block of 5th Street in Washington, D.C. (*Id.*). During the drive, the investigator watched as K.G. texted on her cellphone, ate a granola bar as she drove and sang to the music on the radio. (*Id.*). The investigator noted that traffic was heavy and that K.G. showed no signs of distress. (*Id.*). The investigator watched as K.G. successfully parallel parked her vehicle on the street and then entered the church by dialing a 4-digit code to pass through a secure door. (*Id.*). There were no church services at the time, and a receptionist prohibited the investigator from entering the building without an appointment. (*Id.*). The investigator saw several children leaving a theatre inside the church building. (*Id.*).

At approximately 1:30 p.m., the investigator watched as K,G. left the church and moved her car to the 300 block of F Street. (*Id.*). K.G. again parallel parked her car and re-entered the building by dialing a 4-digit code to pass through a secure door. (*Id.*). K.G. then left the church at approximately 5:15 p.m. and drove back to her residence in Arlington. (*Id.*). As she drove home, K.G. was slowed by rush hour traffic and each time her car stopped she was seen texting on her cell phone. (*Id.*).

Again, this conduct appears inconsistent with K.G.'s reported limitations. At least on this day she was able to function outside her home for over six hours, and her conduct does not demonstrate limitations driving, parking or navigating the route between her home in Arlington and the location in Washington, D.C. K.G. was also able to text while in the car, navigate traffic, sit near other people, and enter a building using a code.

Ultimately, the ALJ reasoned that K.G.'s ability to carry on a full and animated conversation in the waiting room but a few minutes later could only speak slowly, related poorly,

and had difficulty tracking the conversation with Dr. Diller suggested that she was overstating her symptoms and effectively deceiving the doctor during the examination. (AR 1318). This is one of the reasons the ALJ found Dr. Diller's opinions to be unpersuasive.[23] Similarly, the ALJ reasonably concluded that K.G.'s ability to spend a day at a church under circumstances that would seem likely to trigger physical symptoms given her complaints to her doctors also suggested that her symptoms were exaggerated. K.G. did offer explanations for her conduct in the waiting room and her ability to spend the day outside of her house at the church. These explanations claimed that the investigator misunderstood what he saw K.G. do and the two days she was under surveillance were particularly good days on which she was feeling well. The ALJ clearly did not credit these arguments. The ALJ's findings are supported by substantial evidence and are entirely within the province of the ALJ as fact finder.

*ii. Testimony of K.G.*

K.G. testified at the hearing before the ALJ on November 9, 2020. (AR 47-98).[24] K.G. answered questions posed by the ALJ and her counsel. (*Id.*). During her testimony K.G. acknowledged that since her fall in December of 2017, she has gone on five vacations with friends and family. The vacations were to San Diego, California, Seattle, Washington, Charleston, South Carolina, Florida, and Germany. The vacations involved extensive travel, including long-distance airline flights on presumably crowded airplanes. While on vacation, K.G. went to the beach, to the zoo, and kayaking. K.G. took public transportation and saw a production of the Nutcracker. (AR 10, 61-68). K.G. emphasized that she could only have gone on these trips because she received significant care and support from friends and family. (*Id.*).

[23] This is information that Dr. Diller was apparently not privy to when he offered his medical opinion.

[24] As noted above, K.G. elected not to testify at the May 12, 2023 and October 23, 2023 hearings. (AR 1335-39; 1354). However, K.G.'s attorney was present at each hearing. (*Id.*).

In terms of other activities, K.G. testified she was able to take long walks each day (AR 59, 77), do yoga (although yoga frequently triggered physical symptoms) (AR 60), do light housework (AR 73, 76), prepare simple meals (AR 75), care for her cat, and visit with family and friends (AR 61). K.G. was also able to manage her finances, including a checking account, a savings account, credit cards, and pay her mortgage. (AR 80, 81). In addition, K.G. was able to attend church periodically (AR 57) and navigate three flights of stairs to get in and out of her condominium. (AR 72). Finally, K.G. admitted using a GPS while driving and being able to parallel park. (AR 53, 54).

*iii. Testimony of the Vocational Experts*

At the November 9, 2020 hearing, Dominique Warner testified as a vocational expert. (AR 98). Upon questioning from the ALJ and counsel, Ms. Warner testified that given K.G.'s residual functional capacity she could not return to work as an elementary school teacher but based on the Dictionary of Occupational Titles there were jobs that exist in significant numbers in the national economy that K.G. could perform. (AR 98-102). These jobs required only light or medium levels of exertion and included hand packager, order caller, merchandise marker, and office assistant. (*Id.*).

On October 23, 2023, the ALJ held a second hearing after the case had been remanded by the District Court. (AR 1336-53). [25] At the October 23 hearing, Carmine Abraham testified as a vocational expert. (AR 1342). Ms. Abraham was asked hypothetical questions based on the full record, including all new evidence submitted by K.G. in support of her claim since the November 20, 2020 hearing, as well as the ALJ's findings regarding K.G.'s residual functional capacity. (AR

[25] At an earlier hearing held on May 12, 2023, a different vocational expert was prepared to testify but the matter was ultimately continued to October 23, 2023. (AR 1354).

1342-1353). Ms. Abraham's conclusions were consistent with the testimony of Ms. Warner, namely that given K.G.'s residual functional capacity she could not perform her past relevant work as a teacher, but that there were a significant number of jobs in the national economy she could perform. (*Id*.).

**IV. SUMMARY OF THE PARTIES' ARGUMENTS**

K.G. raises two challenges to the ALJ's findings. First, K.G. alleges the ALJ failed to comply with the District Judge's Order on remand to consider "the issues described in open court, including [K.G.'s] capability to sustain regular attendance and performance at work given the number of doctor appointments she must attend and the medical evidence of her symptoms." (Dkt. 12). Specifically, K.G. contends that the ALJ failed to "assess the expected absenteeism" which, according to Dr. Ledebun, would likely be at least four days per month. (*Id*. at pg. 15). Second, K.G. claims the "ALJ's RFC determination is unsupported by substantial evidence as the ALJ failed to weigh the opinion evidence of record in accordance with the prevailing rules and regulations." (*Id.*). On this point, K.G. alleges the ALJ "overlooked or ignored important evidence from [K.G.'s] treating physicians, as well as the CE conducted by Dr. Diller and his assessment [that K.G. suffered from] a marked impairment." (*Id*. at pg. 12).

As to whether the ALJ sufficiently considered K.G.'s future absenteeism, the Commissioner argues, at least inferentially, that the ALJ addressed that issue in the context of all the evidence in the record. (Dkt. 17). As to why the ALJ did not adopt the findings of some of K.G.'s treating physicians, the Commissioner argues that the ALJ applied proper legal standards to resolve factual disputes, and K.G.'s appeal "boil[s] down to a disagreement with how the ALJ weighed the evidence, which is an improper basis for remand." (*Id*. at pg. 12). For the reasons stated below, the Court finds the Commissioner's arguments to be persuasive.

## V. LEGAL SUFFICIENCY OF THE ALJ'S FINDINGS

For the reasons set forth below, the undersigned finds that the ALJ applied the correct legal standards and the ALJ's factual findings were supported by substantial evidence.

*A. Legal Standard*

An ALJ's decision "should include a discussion of which evidence the ALJ found credible and why, and [the] specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). With respect to an ALJ's residual functional capacity findings, the ALJ's decision should "*both* identify evidence that supports his conclusion *and* build an accurate and logical bridge from [that] evidence to his conclusion." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *see also* SSR 96-8p, 61 Fed. Reg. 34,474, 34,478 (July 2, 1996) (residual functional capacity assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence"). But the ALJ's opinion need not refer to every piece of evidence in the record. *Reid v. Commissioner of Social Sec.*, 769 F.3d 861, 865 (4th Cir. 2014); *see Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). Instead, it is the ALJ's role to "sort through the record, assessing which pieces are more persuasive than others." *Drumgold v. Comm'r of Soc. Sec.*, 144 F.4th 596, 603 (4th Cir. 2025).

For claims filed after March 27, 2017, a revised regulatory framework applies to the ALJ's evaluation of the medical opinions or prior administrative medical findings ("PAMFs") of record. *See* 20 C.F.R. § 416.920c. Under the revised regulations, an ALJ does not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or [PAMF(s)][.]" *Id.* § 416.920c(a). The ALJ must instead "articulate [their] consideration" of all medical opinions or PAMFs of record in terms of persuasiveness, considering the factors of

supportability, consistency, relationship with claimant, specialization, and other factors tending to support or contradict a medical opinion or PAMF. *Id.* § 416.920c(c). Of these, supportability and consistency are "most important" factors and the ALJ is required to explain how they were considered in assessing the persuasiveness of each medical opinion or PAMF. *Id.* § 416.920c(b)(2). "Supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or [PAMFs] . . . the more persuasive the medical opinions or [PAMFs] . . . will be." *Id.* § 416.920c(c)(1). "Consistency" means that "[t]he more consistent a medical opinion(s) or [PAMFs] is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or [PAMFs]. . . will be." *Id.* § 416.920c(c)(2).

The regulations require that the persuasiveness of medical opinions or PAMFs be assessed at the "source level," meaning that the ALJ is not required to articulate how they "considered each medical opinion or [PAMF] from one medical source individually"; rather the opinions in the medical source are considered "together using the factors." *Id.* § 416.920c(a), (b)(1). Thus, the new regulations do not require ALJs to perform a separate persuasiveness analysis for each individual limitation assessed by a medical opinion or PAMF. *See, e.g.*, *Angela U. v. Kijakazi*, No. 2:22-cv-34, 2022 WL 3207455, at *8–9 (E.D. Va. July 19, 2022), *R&R adopted*, 2:22-cv-34-RCY, 2022 WL 3161896 (E.D. Va. Aug. 8, 2022) (collecting cases); *Godfrey v. Kijakazi*, 2021 WL 8014681, at *6 (D.S.C. Sept. 10, 2021), *R&R adopted*, 2022 WL 951620 (D.S.C. Mar. 30, 2022) (collecting cases). An ALJ is not required to adopt every limitation proposed by a source that they find persuasive. *See, e.g.*, *Godfrey*, 2022 WL 951620, at *5; *Matthews v. Kijakazi*, 2022 WL 4535087, at *1 n.2 (W.D. Pa. Sept. 28, 2022). Nor is an ALJ that otherwise addresses the source-level persuasiveness of a medical source and explains their RFC required to explicitly address why

they did not adopt certain limitations proposed by that persuasive source.[26] *See, e.g.*, *Godfrey*, 2021 WL 8014681, at *7 (rejecting argument that SSR 96-8p requires ALJ to expressly explain why he did not include RFC limitation that was proposed by one medical source, but not another); *Matthews*, 2022 WL 4535087, at *1 n.2; *Angela D. v. Kijakazi*, 2021 WL 4269361, at *7 (E.D. Va. Sept. 20, 2021); *Yonnes S. v. Saul*, 2021 WL 2767298, at *9 (E.D. Va. Mar. 31, 2021); *Kimberly D. v. Kijakazi*, No. 4:20-cv-159-RCY-LCL, 2022 WL 854840, at * 3 (E.D. Va. Mar. 22, 2022); *Rheanna J.B. v. Commissioner of Social Security*, 2024 WL 1341031, at *9 (S.D. Ill. Mar. 29, 2024).

*B. Analysis*

On remand, the ALJ re-evaluated all the evidence, including the evidence received after the November 9, 2020 hearing. (AR 1315).

*i. The ALJ Findings Regarding K.G.'s Absenteeism are Supported by Substantial Evidence*

K.G.'s first argument is that on remand the ALJ ignored the District Court's Order to assess the effect of K.G.'s absenteeism on her residual functional capacity. However, contrary to K.G.'s claim, the ALJ fully complied with the Court's Order. The ALJ considered the entire record and determined that absenteeism would not prevent K.G. from being gainfully employed. (AR 1317). Specifically, the ALJ's opinion states the following:

> With specific regard to the portion of the District Court's Order addressing the claimant's ability to sustain regular attendance and performance while also attending her various medical appointments, the longitudinal record establishes that

---

[26] SSR 96-8p, in pertinent part, states that "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." 1996 WL 374184, at *7 (July 2, 1996). To the extent that K.G. argues that SSR 96-8p requires the ALJ to explain unadopted opinion limitations lest the ALJ leave an unresolved conflict, K.G. is correct that SSR 96-8p has not been rescinded, but courts are split on whether an "ALJ is required to articulate why he or she did not adopt every recommended limitation by each medical source" in light of the new "source-level" regulations. *See Godfrey*, 2021 WL 8014681, at *4 (collecting cases) ("based on a plain reading of the regulations and given the absence of binding case law on the issue, the undersigned cannot conclude that the ALJ erred"); *id*. at *7 (citing *Holohan v. Massanari*, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) ("We will not defer to SSRs if they are inconsistent with the statute or regulations")). The Court finds the approach taken in the following cited opinions, including those issued by courts in this district, to be persuasive.

> the claimant is capable of participating in numerous regular activities, including but not limited to church, volunteering, traveling with family, attending vacations, theatre shows, and other outings (citations omitted). Accordingly, the claimant has demonstrated the residual functional capacity to schedule activities such as medical appointments in a manner that will minimize the effect of such absences upon her work schedule and allow her to remain gainfully employed. (*Id*.).

In other words, the ALJ determined that because K.G. had demonstrated the ability to balance her medical appointments with social commitments such as attending "church, volunteering, traveling with family, attending vacations, theatre shows, and other outings," then she could address her symptoms and manage her medical appointments in a way that would also permit her to work. Admittedly, this is potentially contrary to some medical opinions, including Dr. Lebedun's belief that K.G. would miss at least four days of work per month due to her condition. (AR 1198). However, the ALJ found Dr. Lebedun's opinions, as well as the other evidence consistent with significant absenteeism, generally unpersuasive. (See for example, AR 1322-23). In assessing the effect of absenteeism on her residual functional capacity, the ALJ gave greater weight to K.G.'s demonstrated ability to function in the community over the more speculative assessments of her inability to manage her condition and her medical appointments while gainfully employed. The ALJ's findings are closely tethered to the facts in the record, and resolving these types of factual disputes is precisely the role of the ALJ. In short, the ALJ's conclusion that absenteeism would have a negligible effect on K.G.'s residual functional capacity is reasonable, sufficiently explained, and supported by substantial evidence.

Moreover, on remand the ALJ considered K.G.'s claim *de novo*. By reconsidering all issues, not just the issues required by the Court on remand, the ALJ evaluated the question of absenteeism anew and in light of the most recent medical and factual evidence.

*ii. The ALJ's Findings Regarding K.G.'s Residual Functional Capacity are Supported by Substantial Evidence*

As noted above, the ALJ concluded that K.G. suffers from a "mild neurocognitive impairment/traumatic brain injury" and that even though her physical and mental limitations prevent her from returning to work as a teacher she has the residual functional capacity to find other jobs that exist in significant numbers in the national economy. (AR 1325). A review of the record reveals that the ALJ reached this conclusion by sorting through the evidence and explaining which evidence he found credible and why, and how that evidence supported his findings. Here, the ALJ properly determined the persuasiveness of inconsistent medical opinions, by evaluating their "supportability" and "consistency."

Again, "supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or [PAMFs] . . . the more persuasive the medical opinions or [PAMFs] . . . will be." *Id.* § 416.920c(c)(1). Here, the ALJ finds that there is no objective medical evidence that supports K.G.'s disability claim. A common thread through each of the physical examinations is that they do not reveal any objective medical condition that would lead to the frequency or the intensity of the debilitating symptoms K.G. reportedly experiences. K.G.'s MRI is normal. K.G. scored a 27 out of 30 on the Mini Mental State Examination ("MMSE"), suggesting a normal range of cognition. K.G.'s Full Scale IQ score was 84, which "placed her comfortably within the low average range of intellectual function as measured by the WAIS-IV." (AR 1172-79; 1314-15).

The evidence in support of K.G.'s claim of disability comes almost entirely from self-reported symptoms along with slight corroboration from a friend and her sister. These statements form the foundation of the opinions of Dr. Jacobs, Dr. Lebedun, Dr. Salata, and Ms. Levin-Alcorn, which are offered in support of K.G.'s claim that she is totally disabled. But these statements find

no support in any objective medical evidence. In addition, these four opinions are often internally inconsistent, contrary to medical and cognitive testing, broadly conclusory and offer little or no factual support. Therefore, the supportability prong weighs heavily in favor of the medical opinions relied upon by the ALJ to determine K.G.'s mild level of impairment and a residual functional capacity that reflects an ability to find and maintain a job.

Also as noted above, "consistency" means that "[t]he more consistent a medical opinion(s) or [PAMFs] is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or [PAMFs]. . . will be." *Id*. § 416.920c(c)(2). The four medical opinions that suggest total disability are materially inconsistent with the majority of medical opinions that find mild impairment and recommend continued treatment and symptom management. The majority of the opinions relied upon by the ALJ are internally consistent, provided by physicians who have examined and spent considerable time with K.G. and whose records reflect a greater degree of detail and a more sophisticated level of analysis.

However, in this case the nonmedical evidence is highly probative and puts much of the medical evidence into context. Here, the undisputed facts are that K.G. lives mostly independently. She is able to live alone and do light housework, prepare simple meals, care for her cat and visit with family and friends. K.G. is able to manage her finances, including a checking account, a savings account, credit cards, and pay her mortgage. (AR 80, 81). K.G. is able to drive, park, use her phone's GPS application and navigate the Washington, D.C. area in traffic. K.G. is able to use her phone to text while sitting in traffic.

Physically, K.G. is able to take long walks each day and sometimes do yoga. She can attend church periodically and navigate three flights of stairs to get in and out of her condominium. K.G. can travel extensively. Since her fall in December of 2017, she has gone on five vacations with

friends and family. The vacations were to San Diego, California, Seattle, Washington, Charleston, South Carolina, Florida, and Germany. The vacations involved extensive travel, including long-distance airline flights on presumably crowded airplanes. While on vacation, K.G. went to the beach, to the zoo, and kayaking. K.G. took public transportation and saw a production of the Nutcracker. These facts paint a very different picture of her ability than what she describes to her doctors.

Finally, and significantly, the surveillance of K.G. on two seemingly random days approximately two weeks apart demonstrates that she has the physical strength and cognitive ability to function in a potential work environment. The day she went to her church she was able to get dressed in the morning, prepare to leave her home for the day, drive to a distant location, use her GPS, navigate heavy traffic, park her vehicle, walk at least a few blocks to the church, remember to move the car midday, park the car again, reenter the building and stay inside for approximately six hours, and finally drive home in heavy traffic and communicate with others by text while sitting in traffic. This too demonstrates an ability to function that is quite different than what K.G. has told her doctors. This suggests a mild level of impairment. This suggests an ability to work.

However, most concerning is the vastly different way in which K.G. presented herself in Dr. Diller's waiting room versus how she acted while being evaluated a short time later by the doctor. The ALJ was unable to reconcile the non-stop talking and laughing in the waiting room with the halting conversation of a cognitively impaired person being examined. The inference the ALJ drew was that K.G. was exaggerating her symptoms. Based on the evidence in the record this was a reasonable inference for the ALJ to draw. This finding is particularly impactful given most

of the factual support for K.G.'s claim comes from the symptoms that she self-reports to her doctors and not from any objective medical findings.

In short, the ALJ properly considered all medical evidence at the source level and sufficiently explained the persuasiveness of that evidence. Therefore, the record – when read as a whole – contains substantial evidence in support of the ALJ's findings, including why the ALJ found the medical evidence relied upon by K.G. to be unpersuasive

## VI. CONCLUSION

Based on the foregoing, the Court finds the ALJ fully complied with the Social Security Administration regulations and issued a reasoned decision supported by substantial evidence. Accordingly, the Commissioner's final decision denying benefits is affirmed, K.G.'s motion for summary judgment (Dkt. 11) is **DENIED**, the Commissioner's motion for summary judgment (Dkt. 16) is **GRANTED**, and the case is **DISMISSED.**

Entered this 30th day of September, 2026.

William E. Fitzpatrick
William E. Fitzpatrick
United States Magistrate Judge

Alexandria, Virginia